IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

INNOVIANT PHARMACY, INC.,

               Plaintiff,

                            Civ. Action No.
                            5:05-CV-0470 (DEP)

    vs.

MAX MORGANSTERN,

               Defendant.

_____

APPEARANCES:                    OF COUNSEL:

FOR PLAINTIFF:

HISCOCK, BARCLAY LAW FIRM    ROBERT A. BARRER, ESQ.
Financial Plaza
221 South Warren Street
PO Box 4878
Syracuse, NY 13221

FOR DEFENDANT:

MEGGESTO, CROSSETT LAW FIRM  JAMES A. MEGGESTO, ESQ.
313 East Willow Street
Suite 201
Syracuse, NY 13203

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

DECISION AND ORDER

      This case calls upon the court to delineate the boundaries of

permissible competition by a salesman working for his former employer's direct competitor in the same geographical territory and servicing the same clientele, and specifically whether he can be prevented, either because of the existence of a restrictive covenant or in light of his alleged misappropriation of proprietary business contact information, from soliciting business contacts of his former employer.  Plaintiff Innoviant Pharmacy, Inc. ("Innoviant"), formerly known as Workers Comp Rx, Inc., has commenced this action against Max Morganstern, one of its former sales executives, seeking to preclude him from competing with Innoviant and soliciting its customer referral sources on behalf of defendant's present employer, an Innoviant competitor.  Innoviant maintains that Morganstern's activities on behalf of its competitor violate a written agreement by the defendant not to compete with it or solicit its customers, following the termination of the employment relationship, and additionally that by doing so, aided by a proprietary list of referral sources impermissibly taken from Innoviant, Morganstern has engaged in unfair competition.

Currently pending before the court in connection with the action is an application by Innoviant for a preliminary injunction, limited in scope,

restraining Morganstern from contacting 114 key New York Innoviant

referral sources for a period of one year.  For the reasons set forth below,

and based principally upon a finding that Innoviant is likely to succeed on

its unfair competition claim and that in the absence of injunctive relief

Innoviant will be irreparably harmed, its motion for a preliminary injunction

will be granted.

I.      BACKGROUND[1]

Innoviant is a Pennsylvania corporation with headquarters in

Huntington Valley, Pennsylvania.  In 1996 Innoviant's predecessor,

Workers Comp Rx, Inc., began operating as a mail order pharmacy

specializing in the sale of prescription drugs to injured workers covered by

workers' compensation insurance.[2]  Innoviant has continued in that

business and currently operates in twenty states, although it estimates

that approximately thirty percent of its revenue is realized from customers

located in New York.  Innoviant currently has two chief competitors,

---

[1]      The following recitation represents the court's findings of fact, as required
under Rule 52(a) of the Federal Rules of Civil Procedure.

[2]      In August of 2004, in preparation for acquisition of the company by
another venture, Workers Comp Rx, Inc. changed its name and operated briefly as
Pharmacy Fulfillment, Inc.  Following the acquisition of its stock Pharmacy Fulfillment
remained intact as a corporate entity, ultimately changing its name to Innoviant
Pharmacy, Inc.

including Injured Workers Pharmacy, organized by a former Workers

Comp Rx, Inc. employee in November of 2001, and Summit Pharmacy,

Inc. ("Summit"), which has been in operation since June, 2004.

Innoviant's business is derived primarily through referrals from

physicians and attorneys who specialize in handling matters involving

injured workers.  Not surprisingly, Innoviant therefore expends significant

effort and expense to identify, cultivate, and maintain such attorney and

physician referral sources.  According to Innoviant's president, Joseph

McCann, at present Innoviant has approximately 975 referral sources

throughout the State of New York, although 114 of those account for the

bulk of Innoviant's referral business within the state.  When an injured

worker – the ultimate "customer" – places an order, Innoviant is generally

aware of the identity of the referring source.  Accordingly, though not

without difficulty, Innoviant is able to track revenues generated by virtue of

a particular revenue source, and in fact utilizes such information to project

future revenues for budgeting purposes.

Defendant Max Morganstern, who resides in Cleveland, New York,

and within this district, was hired by Innoviant's predecessor, Workers

Comp Rx, Inc., in or about January of 2002 as a sales executive servicing

the company's Northeast region, which is comprised of the state of New York.[3]  Prior to the time of his hiring, Morganstern was employed as a paralegal with the Syracuse, New York law firm of Meggesto, Crossett and Valerino, where he was assigned to work as a victim's advocate in certain types of matters, including workers' compensation cases.  In that position Morganstern participated in various activities sponsored by professional organizations focusing upon workplace injuries.  Through his activities with the Meggesto Law Firm, Morganstern met and became acquainted with several of the potential referral sources later called upon by him on behalf of Innoviant.

At the time of his employment, plaintiff entered into a written employment agreement with Workers Comp Rx, Inc., for a term commencing on January 18, 2002, and extending for three years.  Under its provisions that agreement was to be automatically renewed for consecutive, one year terms unless either Morganstern's employment was ended earlier pursuant to the agreement's termination provisions, or notice of non-renewal was given by a party within sixty days prior to the

---

[3]     Morganstern's responsibilities at Workers Comp Rx, Inc. initially extended throughout all of New York other than the metropolitan New York City area, but were later expanded to encompass that region as well.

date of expiration.  The agreement also provided that it was freely terminable on sixty days notice by either party.[4]  Morganstern's employment agreement provided that he was to receive $50,000 per year as compensation, and additionally would be eligible to earn commissions based upon the sales generated as a result of his efforts.

As will be described more fully below, Morganstern's employment agreement with Workers Comp Rx, Inc. contained provisions placing certain restrictions upon his professional activities for a period of one year following termination of the employment relationship.  Included among them was a prohibition against Morganstern's disclosure of certain business information and materials, as well as a corresponding affirmative obligation that he return to his employer all such materials upon termination of the employment relationship.  In addition, the agreement included a restrictive covenant limiting Morganstern's ability to compete with his employer, and further prohibiting him from soliciting its existing or

---

[4]    The provisions which address termination of the agreement are arguably inconsistent.  Section six of the contract appears to envision that termination before the end of the contract term must be by assent of both parties, providing that "[t]his Agreement may be terminated by the <u>mutual</u> agreement of the parties."  Plaintiff's Hearing Exh. 1, § 6.3 (emphasis supplied).  Section three of the agreement, which governs its term, in contrast, states that "either party may terminate this Agreement by giving the other party sixty (60) days prior written notice of termination." *Id.* § 3.

former customers.

During the period of his employment with Workers Comp Rx, Inc. and its successor, Innoviant, Morganstern was one of eight salespersons employed by the company, over most of that time reporting directly to Patti-Ann Kelly, the company's vice-president for sales. Morganstern's responsibilities included the requirement that he identify, target and develop doctors and lawyers as potential referral sources for new patient customers within his assigned territory. As an Innoviant salesperson, defendant was required to prepare and submit sales plans to his employer, and to participate in monthly sales meetings by telephone, as well as quarterly in-person meetings.

Shortly before his resignation, Morganstern was provided by Innoviant with a list, in the form of a spreadsheet transmitted via e-mail, containing approximately 1900 potential New York referral sources to be targeted in a mailing campaign which never materialized.[5] There is little information in the record concerning the list, however, including how it was compiled, and the expense and effort expended by Innoviant in doing so.

In or about February of 2004, an employee handbook was prepared

---

[5]   During the hearing, Morganstern testified that he did not recall receiving such a list.

for Workers Comp Rx, Inc. by its attorneys.  That handbook was

presented to all company employees, who were required to sign a written

document acknowledging their receipt of the handbook and understanding

of its contents.  Included in capital and bolded letters on the handbook

acknowledgment sheet presented to the employees was the following

language:

> **I ACKNOWLEDGE AND UNDERSTAND THAT
> NOTHING CONTAINED IN THE HANDBOOK,
> EMPLOYMENT APPLICATION OR ANY OTHER
> WORKERS COMP RX DOCUMENT, RULE,
> PROCEDURE, POLICY OR PRACTICE MEANS
> THAT WORKERS COMP RX IS PROVIDING ME
> EMPLOYMENT FOR A SPECIFIC PERIOD OF
> TIME OR THAT THERE IS AN EXPRESS OR
> IMPLIED CONTRACT OF EMPLOYMENT OR
> AGREEMENT OF ANY TYPE BETWEEN ME
> AND WORKERS COMP RX I UNDERSTAND
> AND ACKNOWLEDGE THAT I MAY QUIT MY
> JOB OR WORKERS COMP RX MAY END MY
> EMPLOYMENT AT ANY TIME WITH OR
> WITHOUT CAUSE OR NOTICE.**

Plaintiff's Hearing Exh. 3.  An employee acknowledgment sheet containing

this language was signed and returned by Morganstern to his employer on

or about March 18, 2004.

Morganstern resigned from Innoviant's employ in or about February

of 2005, announcing that resignation by letter dated February 24, 2005 to

8

the company's president, Joseph McCann, who received it the following day.  Upon leaving Innoviant Morganstern returned various company property, including his laptop computer, cell phone, and certain marketing materials.  Morganstern did, however, retain certain materials accumulated during the course of his employment, following his resignation.  Included among the materials retained by the defendant was an array of business cards reflecting contact information for certain key referral sources, some of whom were known to Morganstern prior to his hiring by Innoviant.  Additionally, much of the data contained on his cell phone and computer, including the list of 1900 potential referral sources provided to him a short time earlier, and which I find was taken and utilized by the defendant in his new employment, had been deleted prior to his surrender of those items.  Nowhere within the materials returned to Innoviant was any information regarding existing and potential referral sources within Morganstern's territory.

Following his resignation, Morganstern joined Summit as a sales representative, covering the same territory as that previously serviced by him on behalf of Innoviant, and performing essentially the same functions. According to plaintiff's president, Joseph McCann, since Morganstern's

departure the company's revenues have dropped approximately ten percent.  McCann is uncertain, however, whether any referral sources have been lost as a result of Morganstern's departure, and how much business was generated in the past from those sources.

II.    PROCEDURAL HISTORY

Plaintiff commenced this action on April 18, 2005, and on the following day presented the court with a motion seeking the entry of a preliminary injunction.  Dkt. No. 3.  An evidentiary hearing was held before me on April 29, 2005 in connection with plaintiff's preliminary injunction motion, the parties having consented to my jurisdiction in the case, pursuant to 28 U.S.C. §636(c).

III.   DISCUSSION

     A.    Subject Matter Jurisdiction

Plaintiff's complaint alleges diversity of citizenship as a basis for this court's subject matter jurisdiction, as a result of the fact that plaintiff is incorporated and headquartered in Pennsylvania, the defendant is a resident of New York, and the amount in controversy, exclusive of interest and costs, exceeds $75,000.  *See* Complaint (Dkt. No. 1) ¶ 5.  Defendant does not contest this court's subject matter jurisdiction, which I find exists

based upon the record currently before me.  28 U.S.C. § 1332.

B.    Preliminary Injunction Standard

While the claims asserted by the plaintiff are common law causes of action sounding in breach of contract and tort, federal law controls and governs the standard to be applied in determining plaintiff's entitlement to the injunctive relief now sought.  *See Baker's Aid, a Div. of M. Raubvogel Co., Inc. v. Hussmann Foodservice Co.*, 830 F.2d 13, 15 (2d Cir. 1987) (in diversity actions, the question of whether a preliminary injunction should be granted is generally one of federal law); *Systems Operations, Inc. v. Scientific Games Dev. Corp.*, 555 F.2d 1131, 1141 (3d Cir. 1977) ("Although the right upon which this cause of action is based is state-created, Rule 65(a) of the Federal Rules of Civil Procedure contemplates a federal standard as governing requests addressed to federal courts for preliminary injunctions.").  Because such an order affords only temporary relief, there is no danger that the issuance of a preliminary injunction in a federal case such as this, involving only state law causes of action, will seriously interfere with the goals or policies associated with the state created right at issue, and which will ultimately be adjudicated in accordance with state substantive law.  11A Charles Alan Wright, *et al.*,

Federal Practice and Procedure Civ.2d § 2943 (1995).

The prevailing test in this circuit for the granting of a preliminary injunction, while often difficult to apply, is easily articulated.  To qualify for such relief, Innoviant must establish 1) a likelihood that it will experience irreparable harm in the absence of such interim relief, and 2) either a likelihood of success on the merits, or the existence of a sufficiently serious question going to the merits to make them fair ground for litigation and, additionally, that the balance of comparative hardships tips decidedly in its favor.  *Federal Express Corp. v. Federal Espresso, Inc.*, 201 F.3d 168, 173 (2d Cir. 2000); *Otokoyama Co. Ltd. v. Wine of Japan Import, Inc.*, 175 F.3d 266, 270 (2d Cir. 1999); *Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 142 (2d Cir. 1997).  The burden of establishing entitlement to injunctive relief, in accordance with this test, rests with the plaintiff.  *Technical Publ'g Co., Div. of Dun-Donnelly Publ'g Corp. v. Lebhar-Friedman, Inc.*, 729 F.2d 1136, 1139 (7th Cir. 1984); *see also*, *e.g.*, *Capital Servs. of New York, Inc. v. E-Poxy Indus., Inc.*, 196 F.R.D. 11, 12 (N.D.N.Y. 2000) (Kahn, J.).

C.    Choice-of-Law Analysis

Before addressing the legal principles which should control plaintiff's

substantive claims, the court must first determine the law to apply to those claims. "A federal trial court sitting in diversity jurisdiction must apply the law of the forum state to determine the choice-of-law." *Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 393 (2d Cir. 2001) (citing *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 497, 61 S. Ct. 1020 (1941)). In New York, the choice-of-law analysis depends upon the nature of the claim; New York employs distinctly different choice-of-law analyses to contract and tort claims. *Fieger*, 251 F.3d at 394 (citing *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1539-41 (2d Cir. 1997)).

The first step in the conflict analysis under New York choice-of-law rules requires a determination of whether an actual conflict exists between the law of the jurisdictions whose laws are implicated. *Stichting Ter Behartiging van de Belangen van Oudaandeelhoudersin Het Katitaal van Saybolt Int'l B.V. v. Schreiber*, ___ F.3d ___, No. 03-9066, 03-9116, 03-9120, 2005 WL 1023209, at *9 (2d Cir. May 3, 2005) (citing *Matter of Allstate Ins. Co.*, 81 N.Y.2d 219, 223, 613 N.E.2d 936, 597 N.Y.S.2d 904 (1993)). Only in the event of a finding of such a conflict must the court then proceed to choose which of the differing legal principles to apply. *See id.*

13

### 1.   Plaintiff's Tort Claims

The law of unfair competition in Pennsylvania is not materially different from that in New York.  *Compare Norbrook Labs., Ltd. v. G.C. Hanford Mfg. Co.*, 297 F.Supp.2d 463, 491 (N.D.N.Y. 2003) (Munson, S.J.) (citing, *inter alia*, *Eagle Comtronics, Inc. v. Pico Prods., Inc.*, 256 A.D.2d 1202, 1203, 682 N.Y.S.2d 505, 506 (4th Dep't 1998) & *LinkCo, Inc. v. Fujitsu Ltd.*, 230 F.Supp.2d 492, 500 (S.D.N.Y. 2002)) *with Pennsylvania State Univ. v. Univ. Orthopedics, Ltd.*, 706 A.2d 863, 868 (Pa. Super. 1998) (citing *Murphy Door Bed Co. v. Interior Sleep Sys.*, 874 F.2d 95, 102 (2d Cir. 1989)).  Accordingly, I find that given New York's status as the forum state in this matter, and its interest in having its tort law applied to defendant's activities within the state, *see*, *e.g.*, *Cavagnuolo v. Rudin*, No. 94 Civ. 0585, 1996 WL 79861, at *4-*5 (S.D.N.Y. Feb. 26, 1996), New York law should govern the unfair competition and misappropriation of trade secret tort claims.

### 2.   Plaintiff's Contract Claims

Plaintiff's contract claims derive from the January 18, 2002 employment agreement, which specifies that it is to be "governed by, and construed and enforced in accordance with, the laws of the

14

Commonwealth of Pennsylvania." Plaintiff's Hearing Exh. 1, § 13.7.  The

law of restrictive covenants in New York is not materially different from

that in Pennsylvania.  *Compare*, *e.g.*, *Sidco Paper Co. v. Aaron*, 351 A.2d

250, 252 (Pa. 1976), *with Reed, Roberts Assocs., Inc. v. Strauman*, 40

N.Y.2d 303, 307-08, 353 N.E.2d 590, 593, 386 N.Y.S.2d 677, 679-80

(1976).  Moreover, when making choice-of-law determinations both

Pennsylvania and New York give great deference to the parties'

designation of law governing a contract, absent a showing of fraud, bad

faith, violation of public policy, or insufficient contacts of the chosen state

with the transaction.  *Compare Fieger*, 251 F.3d at 393 *and  Zerman v.*

*Ball*, 735 F.2d 15, 19-20 (2d Cir. 1984) *with Cottman Transmission Sys. v.*

*Melody*, 869 F.Supp. 1180, 1183-84 (E.D. Pa. 1994).  Since in this case

there is a complete absence of any allegation of a factor which would

negate the parties' choice of law, I find that Innoviant's contract claims are

governed by Pennsylvania law.

>    D.    Application of Preliminary Injunction Test

>        1.    Irreparable Harm

The primary function to be served by the issuance of a preliminary

injunction is the avoidance of injury or harm for which damages cannot

adequately compensate the moving party.  *See Sampson v. Murray*, 415

U.S. 61, 90, 94 S. Ct. 937, 952-53 (1974); *Register.com, Inc. v. Verio,*

*Inc.*, 356 F.3d 393, 404 (2d Cir. 2004); *Loveridge v. Pendleton Woolen*

*Mills, Inc.*, 788 F.2d 914, 917-18 (2d Cir. 1986).  Consequently, the

lynchpin factor in the preliminary injunction equation is the issue of

irreparable harm; since the issuance of a preliminary injunction represents

extraordinary relief awarded before full litigation of an action's merits, it

should be granted only in the event that the moving party establishes that

if interim relief is not granted, it will suffer irreparable harm which cannot

adequately be redressed by invoking legal remedies.  *See Ticor Title Ins.*

*Co. v. Cohen*, 173 F.3d 63, 68 (2d Cir. 1999).

    "Irreparable harm is an injury that is not remote or speculative but

actual and imminent, and for which a monetary award cannot be adequate

compensation."  *Tom Doherty Assocs., Inc. d/b/a Tor Books v. Saban*

*Entertainment, Inc.*, 60 F.3d 27, 37 (2d Cir. 1995) (internal quotations and

citation omitted); *see also Johnson Controls, Inc.*, 323 F.Supp.2d at 531.

  A showing of irreparable harm is the "single most important prerequisite

for the issuance of a preliminary injunction."  *Cortland Line Co., Inc. v.*

*Vincent*, No. 98-CV-259, 1998 WL 542332, at *3 (N.D.N.Y. Aug. 18, 1998)

(Munson, S.J.) (citing *Bell & Howell: Mamiya Co. Corp. v. Masel Supply Co.*, 719 F.2d 42, 45 (2d Cir. 1983)) (internal quotations omitted); *see Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F. Supp.2d 525, 531 (S.D.N.Y. 2004) (citing, *inter alia*, *Bell & Morrow*).

    As irreparable harm which will be experienced absent the issuance of a preliminary injunction, Innoviant points to Morganstern's interference with its "carefully nurtured" relationships with highly profitable referral sources.  While in his declaration in support of Innoviant's application for a preliminary injunction President Joseph McCann states that it "stands to lose as much as $100,000 in annual revenue" for each referral source converted by Morganstern, *see* McCann Decl. (Dkt. No. 3) ¶ 25, Innoviant now argues that it is unable to assess and quantify the full extent of the loss of referral sources and goodwill which it will realize in the event injunctive relief is not forthcoming.

    In cases such as this, involving a person competing with his or her former employer, particularly when such activity is prohibited by a restrictive covenant or is facilitated by the misappropriation of trade secrets or customer information, courts have often taken a somewhat relaxed approach to the irreparable harm inquiry, and in certain

circumstances have found it appropriate to presume the existence of such

an injury.   *E.g.*, *Wenner Media LLC v. Northern & Shell North Am. Ltd.*,

No. 05 Civ. 1286, 2005 WL 323727, at *3-*4 (S.D.N.Y. Feb. 8, 2005).

"Generally, when a party violates a non-compete clause, the resulting loss

of client relationships and customer good will built up over the years

constitutes irreparable harm." *Johnson Controls, Inc.,* 323 F. Supp.2d at

532.  "Irreparable harm to an employer may also result where an

employee has misappropriated trade secrets or confidential customer

information, including pricing methods, customer lists and customer

preferences." *Johnson Controls, Inc.*, 323 F. Supp.2d at 532-33; *see also*

*FMC Corp. v. Taiwan Tainan Giant Indus. Co., Ltd.,* 730 F.2d 61, 63 (2d

Cir. 1984); *Hillard v. Medtronic, Inc.*, 910 F. Supp. 173, 179 (M.D. Pa.

1995) ("To the extent that the restrictive covenant is being violated,

[former employer] is suffering irreparable harm by the potential loss of

customers posed by [former employee's] activities.").  "Indeed, irreparable

harm is presumed where a trade secret has been misappropriated, even

in the absence of an employment agreement." *Johnson Controls, Inc.*,

323 F.Supp.2d at 533 (citations omitted).

This rule recognizes the difficulty in calculating monetary damages

resulting from the loss of a business relationship with a customer or client which could in the future generate an unknown amount of business and corresponding profits. *Id.* at 532; *see also Ticor Title Ins. Co.*, 173 F.3d at 69-70.  The rule, however, is not absolute; "[u]nder limited circumstances, such as where the loss to an employer can be quantified in terms of a specific amount of lost sales, no irreparable harm is threatened." *Johnson Controls, Inc.*, 323 F.Supp.2d at 532 (citations omitted).

Consistent with the notion that loss of customer goodwill and business revenues in violation of a restrictive covenant or through misuse of proprietary information is not readily susceptible to measurement, Morganstern's employment agreement recognizes that "the misuse, misappropriation or unauthorized disclosure by [him] of [Innoviant's] Confidential Information or the Business Related Information would constitute a breach of trust and would cause serious irreparable injury to [Innoviant.]"  Plaintiff's Hearing Exh. 1, § 7.1.  The agreement also provides that in the event of any breach of its provisions related to improper disclosure of Innoviant's confidential information or violation of the covenant restricting his ability to compete, Innoviant "shall be entitled to a preliminary restraining order or injunction[.]" *Id.* § 10.  These

provisions buttress the conclusion that Morganstern's actions, if unchecked, will give rise to a likelihood of irreparable injury to Innoviant, and indeed could be construed as representing his acknowledgment of this fact. *See Ticor Title Ins. Co.*, 173 F.3d at 69.

Despite this presumption of irreparable harm which generally arises in cases such as this, the evidence presented at the hearing gives some room for pause on this issue. During the preliminary injunction hearing Innoviant's president, Joseph McCann, and its vice president for sales, Patti-Ann Kelly, testified that the company's sales of prescription drugs to injured workers can to some extent be tracked by referral sources. The company therefore has the capability, at least in theory, to determine the level of sales attributable to any particular referral source through manual review of company invoices. Indeed, McCann acknowledged that the company utilizes such information for budgeting purposes by forecasting, based upon extrapolation of past performance data, the potential future profits associated with a particular referral source.

On this basis, one could argue that with the assistance of pretrial discovery, Innoviant can compare its list of New York referral sources to those of Morganstern on behalf of Summit, particularly since

20

Morganstern's territory for both competitors is co-extensive.  Utilizing this information, plaintiff might well be able to estimate damages sustained following Morganstern's departure by ascertaining the customers, and the extent of their business, attributable to any referral sources taken and cultivated by him in violation of his contract and/or the common law.  Speaking to this issue, the Supreme Court has noted that

> [i]t seems clear that the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury.  "The key word in this consideration is irreparable.  Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough.  The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."

*Sampson*, 415 U.S. at 90, 95 S. Ct. at 952-53 (quoting *Virginia Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C. Cir. 1958)).  It could be argued, based upon these facts, that irreparable harm has therefore not been established in this case.  *Viad Corp. v. Cordial*, 299 F. Supp.2d. 466, 481-82 (W.D.Pa. 2003).

In this case, however, unlike in *Viad* and other similar cases, the ultimate source of Innoviant's revenue is one step removed from the

referral sources at issue.  The extent to which Innoviant's efforts to identify and cultivate referral sources and to grow its business through those avenues will be affected by Morganstern's unlimited access to those sources cannot accurately be measured.  This is particularly true since one would anticipate that the existence of those sources, which are not necessarily exclusive to any single supplier, and their levels of referrals, will fluctuate.  Accordingly, and particularly in view of the acknowledgment of this fact in Morganstern's employment agreement, I find that plaintiff has established that absent the issuance of the requested preliminary injunctive relief, it will suffer irreparable harm.

### 2.    Likelihood Of Success

Substantively, plaintiff's complaint sets forth two distinct theories upon which recovery is sought.  Characterizing its accumulated information regarding referral sources as confidential and proprietary, plaintiff asserts that through misappropriating that information utilizing his position of trust and confidence as an Innoviant employee, Morganstern unfairly competed with his former employer.  Plaintiff also alleges that Morganstern's actions in competing with Innoviant, soliciting its referral sources utilizing its confidential information, and refusing to return those

proprietary materials, plaintiff breached his employment agreement with Innoviant.

### a)   Breach of Contract

Innoviant's breach of contract claims are asserted based upon Morganstern's employment agreement, dated January 18, 2002.  Under that agreement, Morganstern promised

> (i) to hold and safeguard the Confidential Information and Business Related Information in trust for [Innoviant]; (ii) not to appropriate or disclose or make available to anyone for use outside of [Innoviant's] organization at anytime [sic], either during the term of this Agreement or subsequent to the expiration of termination of this Agreement for any reason, any Confidential Information or Business Related Information, whether or not developed by Employee, except as required in performance of Employee's duties to [Innoviant], and (iii) upon the expiration of termination [sic] of this Agreement for any reason, to promptly deliver to [Innoviant] all materials and documents belonging to or constituting Confidential Information and Business Related Information, and without limiting the foregoing, any and all other documents and materials containing or constituting Confidential Information or Business Related Information.

Plaintiff's Hearing Exh. 1, § 7.2.  That agreement defines confidential information to include, *inter alia*,

> technical, business or customer information, materials or data relating to the business which has not been previously released to the public with [Innoviant's] authorization, including, but not limited to, confidential information, materials or proprietary data belonging to [E]mployer or relating to

23

Employer's affairs, pertaining to the business[.]

*Id.* § 7.1.  Such restrictions on an employee's use and dissemination of

confidential information are valid and enforceable under Pennsylvania law.

*See Hess v. Gebhard & Co., Inc.*, 808 A.2d 912, 917 (Pa. 2002) (citing

*Sidco Paper Co.*, 351 A.2d at 252-54).

In addition to restricting Morganstern's use of proprietary

information, the contract imposes limitations on his ability to compete,

providing that

> [d]uring the term of this Agreement and for a period ending
> one (1) year from the effective date of termination hereunder,
> Employee shall not, directly or indirectly, own, manage,
> operate, finance, join, control or participate in the
> management, financing, operation or control of, or be
> connected as a partner, principal, agent, representative,
> contractor or otherwise, of any business within a thirty (30)
> mile radius which is in competition with the business engaged
> in by the Employer at the time of the execution [of] this
> Agreement.

Plaintiff's Hearing Exh. 1, § 8.1.  The agreement goes on to provide that

> [d]uring the term of this Agreement and for a period ending
> one (1) year from the effective date of termination hereunder,
> Employee shall not, either directly or indirectly, for his own
> account, or for the account of any person, firm, corporation, or
> enterprise engage [sic] in a competing business, sell to, solicit,
> contact, serve, or cater to any person, firm, corporation or
> other enterprise which is or was a customer of Employer[.]

*Id.* § 8.2.  Innoviant maintains that by working for Summit, one of its chief

24

competitors, and by soliciting its referral sources, Morganstern has

violated both of these contractual provisions.

"An employer's right to protect, by a covenant not to compete,

interest in customer goodwill acquired through the efforts of an employee

is well-established in Pennsylvania." *Sidco Paper Co.*, 351 A.2d at 253-

54. "The reason for this policy is a refusal to allow the employee to profit,

at the expense of his former employer, from his wrongful and inequitable

conduct." *Id.* at 255.

> The type of interests that have been recognized in the context
> of a non-competition covenant include trade secrets or
> confidential information, unique or extraordinary skills,
> customer good will, and investments in an employee
> specialized training program.  In contrast, a post-employment
> covenant that merely seeks to eliminate competition *per se* to
> give the employer an economic advantage is generally not
> enforceable.  The presence of a legitimate, protectable
> business interest of the employer is a threshold requirement
> for an enforceable non-competition covenant.

*Wellspan Health v. Bayliss*, 869 A.2d 990, 996-97 (Pa. Super. 2005)

(citations omitted).  The goodwill of a business is an interest protectable

by a restrictive covenant, even when that goodwill has been acquired with

the assistance, or through the efforts, of the employee whose activities

are sought to be restrained.  *Id.* at 997.  An employer's confidential

information or trade secrets are also generally subject to protection

25

through the use of a restrictive covenant, although information which can be obtained or replicated through legitimate sources may not be shielded by such a covenant. *Id.*

Notwithstanding this general rule, restrictive covenants which impinge upon free competition and thereby "clash . . . with the common law's policy of encouraging free competition" do not find favor in Pennsylvania; accordingly, such agreements are strictly construed, and enforced only to the extent that they are found to be reasonable in scope. *Viad Corp.*, 299 F. Supp.2d at 476 (citing and quoting, *inter alia*, *Hayes v. Altman*, 266 A.2d 269, 271 (1970); internal quotation marks omitted). While restrictive covenants are not regarded as *per se* unreasonable or unenforceable, "Pennsylvania courts have historically been reluctant to enforce contracts that place restraints on trade or on the ability of an individual to earn a living[.]" *Wellspan Health*, 869 A.2d at 996.

To accommodate these competing considerations, courts in Pennsylvania will generally enforce a restrictive covenant only if it is 1) ancillary to an employment contract or to a contract for the sale of goodwill or other property; 2) supported by adequate consideration; 3) reasonably necessary to protect legitimate interest of the employer; and 4) reasonably

26

limited in scope, both in terms of duration and geography.  *Viad Corp.*,

299 F. Supp.2d at 477; *Sidco Paper Co.*, 351 A.2d at 252.  In this case,

the first three of these essential elements are not particularly

controversial.  Since defendant's restrictive covenant is a part of his

employment agreement, it is ancillary to the employment relationship.

*Piercing Pagoda, Inc. v. Hoffner*, 351 A.2d 207, 210-11 (Pa. 1976).

Similarly, because it was agreed to at the inception of employment, the

covenant is deemed to be supported by adequate consideration.

*Geisinger Clinic v. Di Cuccio*, 606 A.2d 509, 513 (Pa. Super. 1992),

*appeal denied*, 637 A.2d 285 (Pa. 1993), *cert. denied*, 513 U.S. 1112, 115

S. Ct. 904 (1995).  The fact that the restrictive covenant was intended to

protect Innoviant's referral sources and its relationships with those

attorneys and physicians establishes that it was designed to protect a

legitimate interest.  *See Sidco Paper Co.*, 351 A.2d at 253-54.

The last issue to be addressed is whether the agreement is

reasonable in scope, in terms of both duration and geographical coverage.

As to duration, Pennsylvania courts have recognized one year as a

reasonable time to preclude a salesperson from competing with a former

employer.  *See, e.g. Plunkett Chem. Co. v. Reeve*, 95 A.2d 925, 927 (Pa.

1953).  The critical issue, as relates to the scope of the restrictive covenant, is whether it is reasonable in its geographical reach.  Section 8.1 of Morganstern's employment agreement prohibits him from competing with Innoviant within a thirty mile radius; the point from which that radius is to be measured, however, is not specified.  Section 8.2 forbids Morganstern from contacting its "customers" for one year and specifies no geographical limitations.  While such a limitless restriction is inherently unreasonable, this shortcoming is not fatal since under Pennsylvania law a court, sitting in equity, may grant enforcement of such an overbroad covenant and, to cure the overbreadth, is empowered to craft, or "blue pencil", a restriction to make it reasonable and enforceable.[6] *Hillard*,  910 F. Supp. at 176-77; *Sidco Paper Co.*, 358 A.2d at 254-55 (citations omitted)*.*  The contract provisions upon which Innoviant relies to support its contract claims are therefore enforceable, subject to modification by the court, if the agreement was in fact in effect when Morganstern left Innoviant's employ.

   In defense of the breach of contract claims, Morganstern contends

---

[6]     In light of my decision that Innoviant is not entitled to enforce the employment agreement, *see* p. 29, *post*, it is unnecessary at this juncture to determine what geographical boundaries would be reasonable and render the restrictive covenant enforceable.

that the written agreement entered at the inception of his employment was no longer operative at the time of his resignation.  To support this contention, Morganstern points to the document which he signed on March 18, 2004 disavowing the existence of any "express or implied contract of employment or agreement of any type between [him] and Workers Comp Rx[.]"  Plaintiff's Hearing Exh. 3 (emphasis omitted).

It is true, as Innoviant argues in response, that under Pennsylvania law an intent to terminate a contractual agreement must be mutual, and demonstrated by "clear, precise and convincing" evidence that the parties agree to terminate the contract.  *See Trustees of First Presbyterian Church of Pittsburgh v. Oliver-Tyrone Corp.*, 375 A.2d 193, 197 (Pa. Super. 1977); *see also Buttonwood Farms, Inc. v. Carson*, 478 A.2d 484, 486-87 (Pa. Super. 1984); *Kirk v. Brentwood Manor Homes, Inc.*, 159 A.2d 48, 50-51 (Pa. Super. 1960).  In this case Innoviant's intention to reform the contract is clear and unequivocal.  In documents drafted by its legal counsel, Innoviant presented Morganstern and its other employees with a handbook and a corresponding agreement which they were directed to sign, acknowledging the non-existence of any written or implied employment contract.  This, coupled with the fact that

29

Morganstern signed the document, clearly evinces the parties' intention to reform the agreement. In any event, even were the court not to adopt this position I would not, sitting in equity, enforce the initial agreement, but instead would find it appropriate to estop the plaintiff from its efforts to enforce the agreement by virtue of its insistence that Morganstern sign a document disavowing the existence of any prior written employment agreement.[7] *See Novelty Knitting Mills, Inc. v. Siskind*, 457 A.2d 502, 503-04 (Pa. 1983) (discussing general principles of equitable estoppel).

In view of the foregoing, I find that plaintiff has not established a likelihood of success on its contract claims, which are based upon the January 18, 2002 employment agreement which I find should not be enforced.

### b)    Common Law Tort Claims

In addition to arguing Morganstern's breach of his initial, written employment agreement, Innoviant asserts that by misappropriating and

---

[7]    As further evidence of the parties' abandonment of the initial agreement, Morganstern cites the fact that Innoviant modified section 5.2 of the contract by eliminating the automobile previously provided and substituting in its place a transportation allowance. Had Innoviant viewed the employment agreement as having been in effect at the time of that change, defendant argues, it would have reduced this modification to writing, executed by both parties, as required for any amendment of the contract. *See* Plaintiff's Hearing Exh. 1, § 13.1. There was, however, no written agreement associated with this change in the automobile allotment provision.

using to his own competitive advantage certain of its proprietary materials,

including contact information for Innoviant referral sources, Morganstern

has engaged in unfair competition.  This claim, I have previously found,

should be controlled by New York law.[8]

> Under New York law, "the gravamen of a claim of
> unfair competition is the bad faith misappropriation
> of a commercial advantage belonging to another
> by infringement or dilution of a trademark or trade
> name or by exploitation of proprietary information
> or trade secrets."  The essence of an unfair
> competition claim is that one may not
> misappropriate the results of the labor, skills and
> expenditures of another; the tort functions to
> protect "property rights of value . . . from *any form*
> of commercial immorality."

*Norbrook Laboratories, Ltd.*, 297 F. Supp.2d at 491(emphasis in original;

internal citations omitted).

Absent a written agreement precluding or restricting such activities,

New York law does not prohibit an employee from engaging in head to

head competition with a former employer, provided that the employee

does not unfairly compete such as through the use of proprietary

information misappropriated from the former employer.  *Leo Silfen, Inc. v.*

*Cream,* 29 N.Y.2d 387, 395, 278 N.E.2d 636, 641, 328 N.Y.S.2d 423, 430

---

[8]      As previously noted, the laws of New York and Pennsylvania relating to
claims of this nature do not differ markedly.  *See ante*, pp. 13-14.

(1972); *Rick J. Jarvis Assocs. Inc. v. Stotler*, 216 A.D.2d 649, 649-51, 627 N.Y.S.2d 810, 811-12 (3d Dep't 1995).  The New York law of unfair competition does, however, prohibit the unauthorized taking and exploitation of internal, proprietary information to assist an employee in competing with a former employer.  *McSpadden v. Caron*, No. 03-CV-6285, 2004 WL 2108394, at *17 (W.D.N.Y. Sept. 20, 2004).  The misappropriation of detailed internal customer information, as is alleged by the plaintiff in this case, can give rise to a claim of unfair competition and, in the event of the finding of irreparable harm, injunctive relief.  *Id.*

Recognizing that not all sales contact information is worthy of trade secret protection, and a sales person cannot be prevented, in the absence of a restrictive covenant, from contacting a customer of his or her former employer where the identity of any such customer is open and known, New York courts distinguish between permissible and impermissible contact with customers of a former employer.  In *Leo Silfen, Inc. v. Cream*, one of the seminal New York decisions regarding use of customer lists by the former employee, the New York Court of Appeals noted that

> [i]n the absence of express agreement to that
> effect between the parties, or a demonstration that
> a customer list has the several attributes of a trade
> secret, courts, without more, should not enjoin an

> ex-employee from engaging in fair and open
> competition with his former employer.

29 N.Y.2d at 395, 278 N.E.2d at 641, 328 N.Y.S.2d at 430.  The court

went on, however, to note that a different result would obtain "[i]f [the

former employees] had been shown to have appropriated by copying,

studied memory, or by some other manner which does not now come to

mind, the detailed information in the customer files[.]"  *Id.*

In this instance the customer information at issue does not possess

the attributes of a trade secret.  The referral sources at issue – attorneys

and physicians specializing in workers' compensation cases within the

state of New York – are readily ascertainable and, presumably, both their

identities and corresponding contact information can be generated from

publically available sources including the Internet, Yellow Pages, and the

membership lists of various professional organizations providing services

in those areas.  Ordinarily, then, under New York law Morganstern could

not be prohibited from contacting those readily available sources,

including any with whom he had dealt while at Innoviant, in the absence of

a written agreement restricting such activities.

The evidence in this case, however, reveals that when leaving

Innoviant Morganstern did in fact take with him customer information,

33

including a list of approximately 1900 potential referral sources, provided to him by management at Innoviant, as well as a collection of business cards accumulated by him regarding existing referral sources.  In doing so, Morganstern traversed the point of demarcation between lawful, indeed healthy, competition and entered the arena of unfair competition. *Leo Silfen, Inc.*, 29 N.Y.2d at 395, 278 N.E.2d at 641, 328 N.Y.S.2d at 430; *McSpadden*, 2004 WL 2108394, at *17.  Under these circumstances, I find that plaintiff Innoviant is likely to succeed on its unfair competition claims.

     E.    <u>Security</u>

     Rule 65 of the Federal Rules of Civil Procedure requires that when issuing a preliminary injunction, the court include a provision for the posting by the moving party of security "for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c); *Corning Inc. v. PicVue Electronics, Ltd.*, 365 F.3d 156, 168 (2d Cir. 2004). The determination of the amount of security to be required rests with the sound discretion of the court.  *Elite Licensing, Inc. v. Thomas Plastics, Inc.*, 250 F.Supp.2d 372, 391 (S.D.N.Y. 2003) (citations omitted).

In this case, it appears that at Summit plaintiff will earn a salary of approximately $65,000 annually, and additionally will have the ability to earn commissions which have been estimated by the defendant to approach $50,000 per year.  Under these circumstances, I find that a bond in the amount of $100,000 will provide assurance that in the event of a finding that the injunction was improvidently issued, Morganstern will be assured adequate compensation for any losses suffered by him.

IV.   SUMMARY AND CONCLUSION

_____The record currently before the court is equivocal, at best, regarding plaintiff's chances of success on the merits of its breach of contract claims.  Serious questions exist as to whether the initial contract under which Morganstern was hired, and which forms the basis for plaintiff's breach of contract claims, remained in effect at the time of his resignation, given that he was directed in March of 2004 by Innoviant to sign a document stating that there are no implied or express agreements in force governing his employment.  Innoviant is, however, likely to succeed in establishing that Morganstern engaged in unfair competition by misappropriating certain Innoviant documents developed through its expense and labors, and using them to the benefit of himself and his

35

competitor following termination of the employment relationship.  In light of

this finding, and the fact that plaintiff has carried its burden of

demonstrating the existence of irreparable harm associated with that

potential breach, I find it appropriate to enjoin Morganstern from

contacting the 114 key New York Innoviant referral sources referenced in

plaintiff's motion.  The issuance of that preliminary injunction will be

conditioned upon plaintiff's posting of security to ensure that in the event

of a finding that the injunction should not have been granted, defendant

can be adequately compensated for any losses suffered.

A question remains as to the appropriate duration of the preliminary

injunction, and specifically whether it should be temporally limited.

Although the injunction is being issued based upon my finding that

defendant has engaged in unfair competition by taking and

misappropriating to his competitive advantage customer information, I

have looked to the parties' agreement for guidance as to the reasonable

extent of any such restriction.  Given that the referral sources at issue are

most likely easily discernible by Morganstern and others in his field

through sources independent of Innoviant's confidential information, I find

that the imposition of a preliminary injunction for a period of one year, or

36

until this case is finally resolved – whichever occurs earlier – is adequate to protect the plaintiff's interests.

Based upon the foregoing it is hereby

ORDERED, that plaintiff's motion for a preliminary injunction (Dkt. No. 3) be and hereby is GRANTED; and it is further

ORDERED, that defendant Max Morganstern hereby is enjoined and restrained from contacting the 114 referral sources set forth in a list attached to the supplemental declaration of Joseph J. McCann, dated April 25, 2005 (Dkt. No. 8) which was filed under seal, and which will be provided separately to defendant, through his counsel.  This injunction shall extend for a period of one year from the date of defendant's resignation, or February 24, 2006, or the date upon which this action, including any appeals, is finally resolved, whichever occurs first, and shall be conditioned upon the posting by plaintiff of security in the amount of $100,000 within ten (10) business days of the date of this order.

May 12, 2005
Syracuse, NY

David E. Peebles
U.S. Magistrate Judge